Mar. 16, } No. 3925.
1950.

OPINION OF THE JUSTICES.

518

*Perkins Bass* and *Richard F. Upton* (by brief and orally), for the constitutionality of the reorganization act (Laws 1949, *c.* 43).

*Stanley M. Brown* (by brief and orally), opposed.

*Robert P. Bingham* (orally), opposed.

*Charles A. Holden* (by brief and orally), also opposed.

*To His Excellency the Governor and the Honorable Council:*

In reply to the question, "Does said act or any provision thereof conflict with the Constitution of the State of New Hampshire?", in our opinion, the answer is "No." We, the undersigned Justices, are guided in the first instance by the opinion rendered in *Musgrove* v. *Parker*, 84 N. H. 550. "The constitutionality of an act passed by the coordinate branch of the government is to be presumed. It will not be declared to be invalid except upon unescapable grounds." *Id.*, 551. This case involved the delegation of legislative power to the Fish and Game Department to restrict the taking of fish or game by regulation when the board should find that such action was "necessary to insure the preservation or perpetuation of any kind of fish, game or furbearing animals . . . ." *Id.*, 552. So here, we feel obliged, if possible, to give effect to the clear expression of the will of the Legislature as stated in chapter 43, Laws 1949.

What the present statute plainly seeks to accomplish is delegation to the Governor of the power to reorganize the departments and agencies of the executive branch of the government for the purposes of promoting efficiency and economy in that branch. The purpose of the delegation of legislative power is stated; the standards that must be followed are prescribed; and various limitations upon the power granted are made.

As has already been seen, the delegation of subsidiary legislative power is nothing new. We list some of the authorities in New Hampshire for this procedure with a brief statement in parenthesis of the delegate and the objective to be accomplished. *State* v. *Normand*, 76 N. H. 541 (to the State Board of Health to make regulations "to secure greater cleanliness in food when exposed for sale"); *Grafton &c. Company* v. *State*, 77 N. H. 539 (the Public Service Commission was to be guided by "what is for the public good"); *Conway* v. *Water Resources Board*, 89 N. H. 346 (the Water Resources Board could determine what projects "the State construct" for the conservation of water resources; *State* v. *Langley*, 92 N. H. 136 (to the Commissioner of Motor Vehicles the power to determine "a speed limit which is reasonable and safe" outside certain districts); *St. Regis Company* v. *Board*, 92 N. H. 164 (to the Water Resources Board "to use and control all public waters of the state" to the extent necessary to construct a conservation project); *Meredith* v. *State*, 94 N. H. 123 (to the State Board of Health to direct that a town install "a suitable public system of sewerage"); *Opinion of the Justices*, 94 N. H. 510

(to a board of investigation to determine whether bond issues in excess of fixed debt limits are "in the best interest of and within the financial capacity of" school districts); *Opinion of the Justices,* 94 N. H. 515 (to a state agency to determine "eligibility for state assistance of any housing project").

The same kind of delegation to the chief executive to reorganize that branch of the government in the furtherance of efficiency and economy that is granted in chapter 43, has been upheld in the federal courts. "The result [of power granted to the President in the furtherance of efficiency and economy] was to abolish a board whose existence was dependent upon the will of Congress and to delegate to the Department of Commerce the same powers and duties the board had possessed. This seems in accord with correct standards as to delegation of authority to act within proper limits prescribed by Congress." *Isbrandtsen-Moller Company* v. *United States,* 14 F. Supp. 407, 412. The conclusion reached in this case was approved in *Swayne & Holt* v. *United States,* 18 F. Supp. 25.

What may and may not be delegated is distinguished in *Ferretti* v. *Jackson,* 88 N. H. 296, 299: "The constitution permits the legislature to empower the executive department to enact legislation of a subordinate nature to a general law to meet the necessities of government. 'The supreme legislative power' (Const., Pt. II, *Art.* 2) is vested in the legislature, but not the sole and exclusive power in respect to incidental and subsidiary legislation." On page 302 of the opinion, the court stated the need "of a declared policy and of a prescribed standard." In the recent case of *American Power Company* v. *Securities & Exchange Commission,* 329 U. S. 90, 105, the court declares the constitutional requirements as follows: "Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."

In determining the constitutionality of a legislative enactment, if there is doubt, it is proper to consider the need for the measure. "It is *a constitution* we are expounding . . . intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *M'Culloch* v. *Maryland,* 4 Wheat. 316, 407, 415. "The Constitution, viewed as a continuously operative charter of government, is not to be interpreted as demanding the impossible or the impracticable." *Opp Cotton Mills* v. *Administrator,* 312 U. S.126,145.

That there is need of some body other than the Legislature to deal with this broad and complex subject of reorganization of the executive part of the government that requires so much time, detailed work and expert knowledge and that involves so many diverse and conflicting interests, may well have prompted the enactment of the measure. The truth of this statement is attested by the Legislature itself in its assertion in the last paragraph of section 1 of the act: "The general court declares that the public interest requires the carrying out of the purposes specified in this section and that such purposes may be accomplished more speedily and effectively under this act than by the enactment of specific, individual pieces of legislation covering each agency affected." "However, past history demonstrates that the passage of such legislation [effecting structural changes] is unlikely. Apparently, better results are obtained, if, as in 1933, 1939, and 1945, the President is authorized by a reorganization act to accomplish the necessary changes. . . . In recent years there has been increased appreciation of the necessity for permitting Congress to designate another body to fill in the details of its legislative policy and the courts have found the standards in legislation involving delegation to be adequate . . . Indeed, it is questionable whether the courts today would even subject the standards in reorganization legislation to severe scrutiny . . . Where, as here, the Government is directing its action inward, toward its own structure and procedure, there is less need for clearly defined standards." Reorganization of the Executive Branch, 48 Col. L. Rev., 1221, 1222, 1223, 1224.

The tests for the delegation of subordinate legislative power such as we are now considering that were stated in the *Ferretti* case, are amply complied with in chapter 43. The purpose of the Legislature in making into law chapter 43 is evident from the title, the declaration of purposes in section 1, the last paragraph of said section quoted above and the other provisions of the act. As already briefly stated, its purpose was to delegate to the Governor the power to reorganize the departments and agencies of the executive arm of the government so as to accomplish greater economy and efficiency. There can be no misunderstanding as to the meaning of this purpose and none has become evident from the arguments. It is as definite as many of the purposes for which delegation has been upheld in the past. Those asserting the chapter to be invalid offer no suggestion as to how the purpose could be made more specific. It has been suggested that in certain similar federal laws, some of the federal departments were excepted from the application of the laws. Such a provision would

mean simply that the power granted was to be exercised on a smaller scale. It would not make more definite or more concrete either the purpose or the standards prescribed.

The standards prescribed by the Legislature for effecting the purpose sought are set forth in section 1 of the act. They are as follows: (a) to promote economy consistent with efficiency; (b) to insure efficiency so far as revenues permit; (c) to group, coordinate and consolidate agencies and functions according to major purposes; (d) to reduce the number of agencies by regrouping and by abolishing those not needed; and (e) to eliminate overlapping and duplication of effort. No additional standard has been suggested by the opponents of the act that, in their opinion, is necessary to make it comply with the constitutional requirements. Those set forth are as definite as in any other act that has come to our attention and as the nature of the matter permits.

In addition to a declaration of the purpose of the power delegated and of the standards that must be met in its exercise, various definite and narrow limits or boundaries to the power given are provided for in the act.

The authority granted is not a continuous one but is for one reorganization and expires on July 30, 1950.

The Governor has no power whatsoever under the act to create entirely new agencies or functions without regard to those existing. He must deal with the existing framework of the executive department and the activities now authorized. His sole objective is to streamline that department and make it more effective for the money appropriated. This concept of the power of the Governor being limited to reorganization of the present departments and agencies through transfer, abolition, consolidation and coordination would seem to dispose of the criticism that the delegation tends to make the Governor autocratic. Moreover, in the future he will be granted such powers and only such as the Legislature may choose to give him. The elected representatives of the people will still determine what subsidiary legislation shall be delegated.

With respect to the powers and duties bestowed, the Governor is limited, as stated in section 2, to what "is necessary to accomplish one or more of the purposes of section 1." These purposes were briefly stated in our own words in the paragraph in which were discussed the standards prescribed. He cannot change the present departments and agencies except in furtherance of these purposes.

It should be noted that the Governor is not dealing, under this

act, with private rights or personal liberties but merely with the structure and functions of that branch of the state government of which he is the head. "The authorities which the defendants cite upon the question of requisite standards in statutes are those involving action by the government in its sovereign capacity, that is, where it reaches out to deal with, direct, or regulate the conduct of the citizen; in some instances against the will of the citizen, and often in interference with the citizen's own property or contract rights. . . . There the law requires strict boundaries to be erected by the statute around the exercise of power by official or board to whom is surrendered so much of the Congressional power as is necessary to fill in the details of the statute enacted." *United States* v. *General Petroleum Corporation*, 73 F. Supp. 225, 250. That subordinate legislative power can be more readily delegated under these circumstances was recognized in *Conway* v. *Water Resources Board, supra*, 352: "Here the authority is not to enact laws. The regulatory control is of public resources. No direction and control over private enterprise is intended to be granted, and the functions of the Board are essentially executive with the area of operations clearly outlined." The power to abolish all or any part of any agency or function is not a veto upon any act of the Legislature in the past in establishing departments and agencies. It must be interpreted in the light of the purposes declared and the standards set up. An agency can be abolished only if its function has been transferred or otherwise substantially lost, so that practically the agency is useless. An entire function can be abolished only if it is a duplication of another so that it renders no real service to the public. It was not the intention of the Legislature that the Governor substitute his idea of what were desirable agencies and functions for that of the Legislature.

So, the power to provide for the appointment, term of office and compensation of the heads and assistant heads of agencies is limited to carrying out the purposes of the act. Such power exists only where action under the statute makes it reasonably necessary. It is not a general power but incidental and subordinate to the provisions of the act. It is made necessary because of the fact that the duties and responsibilities of the heads and assistant heads may be quite different under the reorganization. The power is similar to that exercised by the classification plan board under chapter 207, Laws 1945. See also, the power of the Governor under section 18, chapter 27 of the Revised Laws.

In submitting his plan to the Legislature the Governor must include

findings indicating that the changes are necessary to accomplish one or more of the purposes of section 1. He has the cooperation and advice of a commission of nine qualified persons, at least five of whom shall be members of the Legislature. Laws 1949, c. 86.

The reorganization plan must be submitted to the Legislature and cannot become effective until the expiration of twenty-five legislative days and then only if there has not been passed by the two houses a concurrent resolution against it. The entire plan or one or more parts may be disapproved. It should not be necessary to state that this provision was not intended by the Legislature as an enactment into law of the proposed plan. It is merely one of the checks or restraints upon the exercise of the subordinate legislative power delegated to the Governor. Accordingly, Article 2 of Part Second of the Constitution has no application. The provision there contained that each house shall have a negative on the other relates to the supreme legislative power when used for the passage of statutes, as for instance, in the enactment of said chapter 43. It is clear that, although the two houses must concur, this provision of the statute should be effective against any abuse in the exercise of the power delegated. It is highly improbable that either house would fail to concur in disapproval of an abuse.

Furthermore, the Legislature has a practical check upon the reorganized executive in the matter of the appropriations for running the state departments that are made on a year to year basis. In appropriating or not appropriating money for a department or its subdivisions or for the carrying out of particular services, the Legislature has a fundamental control over any reorganization whether proposed or made. It probably is unnecessary to add that no vested rights accrue as a result of action taken under chapter 43. Anything done can be altered in any way or abolished by the usual statutory enactment.

The purpose of chapter 43 is clear; the standards prescribed are as definite as the nature of the purpose permits. Various limitations upon the power granted are made. The delegation made is within the constitutional requirements. It is limited to a plan or plans to take effect now and no power need be given in the future save such as the elected representatives of the people may choose. Our answer to the question asked is, "No."

FRANCIS W. JOHNSTON.
FRANK R. KENISON.

March 16, 1950.