Request of the Senate
No. 2011-319

OPINION OF THE JUSTICES
(Requiring Attorney General To Join Lawsuit)

Submitted: May 23, 2011
Opinion Issued: June 15, 2011

The New Hampshire Senate (Senate) adopted the following resolution on May 4, 2011, and filed it with the supreme court on May 5, 2011:

"Whereas, there is pending in the senate HB 89, 'An act requiring the attorney general to join the lawsuit challenging the Patient Protection and Affordable Care Act;' and

"Whereas, HB 89 as passed by the house of representatives and presently pending before the senate would require the attorney general to move to join the state of New Hampshire as a plaintiff in the lawsuit pending in federal court captioned State of Florida et al. v. United States Department of Health and Human Services et al. (hereinafter 'the lawsuit'); and

"Whereas, at least 27 of the 50 states have joined as plaintiffs in the lawsuit; and

"Whereas, the lawsuit challenges the applicability of portions of a federal law that would require individual New Hampshire citizens to purchase health insurance, even if they did not wish to do so; and

"Whereas, the provisions being challenged in the lawsuit reflect matters of broad public policy, but do not presently affect the individual liberty or property interests of any individual New Hampshire citizen; and

"Whereas, Part II, Article 5 of the New Hampshire constitution states: 'full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions, either with penalties, or without, so as the same be not repugnant or contrary to this constitution;' and

"Whereas, Part I, Article 37 of the New Hampshire constitution sets forth the principle of separation of powers as an integral part of our governmental system of checks and balances; and

"Whereas, a question has arisen as to the constitutionality of the provision in HB 89 requiring the attorney general to join the lawsuit; now, therefore, be it

"Resolved by the Senate:

"That the justices of the supreme court be respectfully requested to give their opinion upon the following questions of law:

"1. Does the requirement in HB 89 that the attorney general move to have the state of New Hampshire join as a plaintiff in the lawsuit, violate Part I, Article 37 of the New Hampshire constitution?

"2. Does the requirement in HB 89 that the attorney general move to have the state of New Hampshire join as a plaintiff in the lawsuit, fall within the broad grant of authority to the general court set forth in Part II, Article 5 of the New Hampshire constitution?

"3. Does HB 89 as adopted by the house of representatives and presently pending before the senate violate any other provision of the New Hampshire constitution?"

*To the Honorable Senate*:

The following response is respectfully returned:

House Bill (HB) 89 as passed by the New Hampshire House of Representatives (House) requires the attorney general, "no later than July 1, 2011," to join the state of New Hampshire as a plaintiff in the lawsuit pending in federal court captioned *State of Florida et al. v. United States Department of Health and Human Services et al.* (the Florida case). *See Florida ex rel. Bondi v. United States Dept. of Health and Human Services*, No. 3:10-cv-91-RV/EMT, 2011 WL 285683 (N.D. Fla. Jan. 31, 2011), *clarified by* 2011 WL 723117 (N.D. Fla. Mar. 3, 2011). The Florida case challenges the constitutionality of the Federal Patient Protection and Affordable Care Act. It was brought by the attorneys general and/or the governors of at least twenty-six states and others against the United States Departments of Health and Human Services, Treasury and Labor and their secretaries. *See id.* at *1.

You have asked that the undersigned justices of the supreme court render an advisory opinion as to whether HB 89 is constitutional. *See* N.H. CONST. pt. II, art. 74. Part II, Article 74 of the New Hampshire Constitution provides, "Each branch of the legislature as well as the governor and council shall have authority to *require* the opinions of the justices of the supreme court upon important questions of law and upon solemn occasions." N.H. CONST. pt. II, art. 74 (emphasis added). While these coordinate branches of government have no obligation to seek our opinion, where, as here, one house of the legislature has done so, we are required to perform our constitutional duty by providing our opinion, save in certain narrow circumstances that do not apply here. *See Opinion of the Justices (Appointment of Chief Justice)*, 150 N.H. 355, 356 (2003) (supreme court justices have "no authority under Part II, Article 74 to issue advisory opinions to either branch of the legislature regarding existing legislation"); *Opinion of the Justices*, 123 N.H. 510, 511 (1983) (supreme court justices are not "empowered to give advisory opinions on legal questions involving resolution of questions of fact"). "It is the role of this court in our co-equal, tripartite form of government to interpret the Constitution and to resolve disputes arising under it." *Petition of Below*, 151 N.H. 135, 139 (2004) (quotation omitted). However, our intent is only to answer the questions posed, not to opine upon whether HB 89 reflects a wise public policy. *See Smith Insurance, Inc. v. Grievance Committee*, 120 N.H. 856, 863 (1980). We leave such matters to the other branches of government. *See id.; see also Mahan v. N.H. Dep't of Admin. Services*, 141 N.H. 747, 749-50 (1997) (judiciary is reluctant to evaluate the wisdom of an executive or legislative choice of public policy goals or the means to achieve them).

You have asked three questions about the constitutional validity of HB 89. Your first question asks whether HB 89, as passed by the House, would violate Part I, Article 37 of the New Hampshire Constitution. We answer in the affirmative. Your second question asks whether HB 89's requirement that the attorney general join the State as a plaintiff in the Florida case falls within the grant of authority to the general court set forth in Part II, Article 5 of the New Hampshire Constitution. We answer this question in the negative. Your third question asks whether HB 89, as passed by the House, violates any other provision of the New Hampshire Constitution. Historically, we have declined to answer general inquiries on constitutional infirmity and, in keeping with that practice, we respectfully decline to answer the third question. *See Opinion of the Justices (Weirs Beach)*, 134 N.H. 711, 717 (1991).

*I. Standard of Review*

■ Before setting forth our analysis regarding your first and second questions, we note the proper standard of review. "When we interpret statutes already in effect, they are construed to avoid conflict with constitutional rights wherever reasonably possible." *Opinion of the Justices (Certain Evidence in Sexual Assault Cases)*, 140 N.H. 22, 26 (1995) (quotation omitted). The same standard applies when we review proposed legislation "for it is understood that the [legislation] if enacted will be construed harmoniously with an individual's constitutional rights in any given case." *Id.* at 26-27. Thus, in reviewing proposed legislation, as when we review an existing statute, "we presume it to be constitutional and will not declare it invalid except upon inescapable grounds." *New Hampshire Health Care Assoc. v. Governor*, 161 N.H. 378, 385 (2011) (quotation omitted). This means that "we will not hold [the act] to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Id.* (quotation omitted). "It also means that when doubts exist as to the constitutionality of a [legislative act], those doubts must be resolved in favor of its constitutionality." *Id.* (quotation omitted).

*II. Part II, Article 5*

Your second question asks whether "the requirement in HB 89 that the attorney general move to have the state of New Hampshire join as a plaintiff in the lawsuit, fall[s] within the broad grant of authority to the general court set forth in Part II, Article 5 of the New Hampshire constitution." Part II, Article 5 empowers the legislature, among other things, "to set forth the several duties, powers, and limits, of the several civil and military officers of this state . . . so as the same be not repugnant or contrary to this constitution." N.H. CONST. pt. II, art. 5.

■ The plain language of Part II, Article 5 authorizes the legislature to set the duties of civil officers *only* to the extent that doing so does not contravene the constitution. The constitution, thus, makes the legislature's authority pursuant to Part II, Article 5 subject to other constitutional provisions such as the Separation of Powers Clause. Therefore, if setting forth a duty violates *another* provision of the constitution, then such action does *not* "fall within the broad grant of authority" Part II, Article 5 confers upon the legislature. Accordingly, if HB 89 violates the Separation of Powers Clause, it is "repugnant or contrary to [our] constitution," and does not "fall within the broad grant of authority to the general court set forth in Part II, Article 5." Because our answer to your second question depends upon our answer to your first, we turn now to your first question.

## III. Separation of Powers

Your first question asks whether HB 89 would violate the separation of powers doctrine set forth in Part I, Article 37 of the State Constitution. Part I, Article 37 provides:

> In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the ·constitution in one indissoluble bond of union and amity.

"The concept of the separation of powers contained in virtually every American constitution was designed to protect the people from the tyranny of government which could result from the accumulation of unbridled power in any one branch of the government." *Opinion of the Justices*, 121 N.H. 552, 556 (1981).

■ "We have long acknowledged that the complete separation of powers would interfere with the efficient operation of government, and that consequently there must be some overlapping of the power of each branch." *Id*. The drafters of our constitution recognized this political reality, and provided that the "three essential powers [of government] ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of unity and amity." N.H. CONST. pt. I, art 37; *see Opinion of the Justices*, 121 N.H. at 556. Nonetheless, while, as a practical matter, there must be some overlapping among the three branches of government, the New Hampshire

Separation of Powers Clause is violated when one branch usurps an essential power of another. *New Hampshire Health Care Assoc.,* 161 N.H. at 386.

In this matter, we must consider whether the legislature, by mandating that the attorney general join the State of New Hampshire as a party in the Florida case opposing the federal law, would usurp an essential power of the executive branch. *See Duquette v. Warden, N.H. State Prison,* 154 N.H. 737, 747 (2007). We, therefore, begin by examining the constitutional powers of the legislative and executive branches.

■ Part II, Article 2 of the State Constitution vests the legislature with the "supreme legislative power," which specifically includes the power to make laws, name certain civil officers, and define the duties of "the several civil and military officers of this state." N.H. CONST. pt. II, art. 5; *see New Hampshire Health Care Assoc.,* 161 N.H. at 386. These powers are among the legislature's "essential" powers.

■ "The panoply of powers granted to the Governor and Council by the Constitution . . . of this state is extensive." *Barry v. King,* 106 N.H. 279, 281 (1965). Part II, Article 41 of the State Constitution provides that the Governor is the "supreme executive magistrate."[1] The constitution makes the Governor "responsible for the faithful execution of the laws." N.H. CONST. pt. II, art. 41. The power to execute laws, therefore, is one of the executive branch's "essential powers."

At issue is whether directing the attorney general to initiate a specific civil lawsuit, here by joining the State to an existing case as a plaintiff, would usurp an essential power of the executive branch. To determine whether HB 89 would usurp an essential power of the executive branch, we must examine the meaning of the phrase "faithful execution of the laws" as contained in Part II, Article 41.

When our inquiry requires us to interpret a provision of the constitution, we must look to its purpose and intent. *Bd. of Trustees, N.H. Judicial Ret. Plan v. Sec'y of State,* 161 N.H. 49, 53 (2010). We first look to the natural significance of the words used by the framers. *Id.* "The simplest and most obvious interpretation of a constitution, if in itself sensible, is most likely to be that meant by the people in its adoption." *Id.* (quotation omitted).

"While the constitution as it now stands is to be considered as a whole as if enacted at one time, to ascertain the meaning of particular expressions it may be necessary to give attention to the circumstances under which they

---

[1] We use the term "Governor" because it is the term used in the New Hampshire Constitution, but express no opinion as to whether the term refers to the Governor alone or also includes the Executive Council.

became parts of the instrument." *Id.* at 53-54 (quotation omitted). "By reviewing the history of the constitution and its amendments, the court endeavors to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Baines v. N.H. Senate President,* 152 N.H. 124, 133 (2005) (quotation omitted).

When interpreting the meaning of a constitutional provision adopted by popular vote, we will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast. *See Town of Canaan v. Sec'y of State,* 157 N.H. 795, 799 (2008). "The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted." *Id.* (quotation omitted). We consider a delegate's statements in determining the meaning of an amendment if the statements interpret the amendment's language "in accordance with its plain and common meaning while being reflective of its known purpose or object." *Bd. of Trustees, N.H. Judicial Ret. Plan,* 161 N.H. at 55 (quotation omitted).

New Hampshire adopted its first constitution in 1776 after the State became independent of British rule. *Warburton v. Thomas,* 136 N.H. 383, 388 (1992). This constitution, which was a temporary document, centered all the governing power in the legislature. *Id.* It did not provide for a governor or any other executive officer; nor did it provide for an independent judiciary. *Id.* "The centralization of power in the legislature reflected the framers' distrust of the unchecked power of the royal governors under England's rule." *Id.*

The 1776 temporary constitution remained in effect until 1784. *Id.* At that time, the Separation of Powers Clause, Part I, Article 37, was added to the constitution, as was Part II, Article 41, which, for the first time, created the executive as a separate branch of government. *See* MANUAL OF THE CONSTITUTION 109, 116, 125-30 (1902). "As applied to the executive[,] the primary purpose [of Part I, Article 37] is to protect it from legislative encroachment." *Opinion of the Justices,* 118 N.H. 582, 585 (1978).

When Part II, Article 41 first became part of our constitution in 1784, it provided only: "There shall be a supreme executive magistrate who shall be styled The President of the State of New Hampshire, and whose title shall be His Excellency." *Manual of the Constitution, supra* at 125. In 1792, this single sentence was amended to change the name of the executive to the Governor. *Id.* at 147, 177.

The grant of power in Part II, Article 41, making the Governor the "supreme executive magistrate," is "something more than a verbal adornment of the office." *Barry*, 106 N.H. at 281 (quotation omitted). It "implies such power as will secure an efficient execution of the laws." *State v. Dawson*, 119 P. 360, 363 (Kan. 1911). The 1792 constitution empowered the Governor to implement this grant of power by convening the Executive Council "for ordering and directing the affairs of the state, according to the laws of the land," N.H. CONST. pt. II, art. 62. *See Barry*, 106 N.H. at 281; *see also* S. MARSHALL, THE NEW HAMPSHIRE STATE CONSTITUTION: A REFERENCE GUIDE 177 (2004).

Part II, Article 41 was next amended nearly two hundred years later, in 1966, as a result of the 1964 constitutional convention. *See Opinion of the Justices*, 113 N.H. 141, 148 (1973). "All but the first sentence of this article was added by the constitutional amendment in 1966." *Id.*; *see* JOURNAL OF CONSTITUTIONAL CONVENTION 287, 289, 292, 313, 315 (June 10, 1964). As a result of the 1964 constitutional convention, Part II, Article 41 now reads:

> There shall be a supreme executive magistrate, who shall be styled the Governor of the State of New Hampshire, and whose title shall be His Excellency. The executive power of the state is vested in the governor. The governor shall be responsible for the faithful execution of the laws. He may, by appropriate court action or proceeding brought in the name of the state, enforce compliance with any constitutional or legislative mandate, or restrain violation of any constitutional or legislative power, duty, or right, by any officer, department or agency of the state. This authority shall not be construed to authorize any action or proceedings against the legislative or judicial branches.

■ As amended, Part II, Article 41 makes clear that the Governor is responsible for "the faithful execution of the laws." It also provides an additional method for implementing this power: the Governor may initiate court actions in the name of the state to "enforce compliance with any constitutional or legislative mandate" or to "restrain violation of any constitutional or legislative power, duty, or right by any officer, department or agency of the state." As we noted in *Opinion of the Justices*, 113 N.H. at 148, the amendments to Part II, Article 41 were intended "to impose a duty upon the executive to carry out the legislative mandates as well as to enforce constitutional requirements."

Statements of delegates at the 1964 constitutional convention as well as the ballot question posed to the voters confirm this interpretation. The ratified amendments to Part II, Article 41 had their genesis in Resolution 58 of the 1964 constitutional convention. *See* JOURNAL OF CONSTITUTIONAL

CONVENTION, *supra* at 404 (index). Resolution 58 was a resolution "establishing the executive power in the governor, placing executive departments of the state under his supervision, and charging him with execution of the laws." *Id.* According to the ballot question posed to the voters, its purpose was "to clarify and reinforce the executive powers of the governor by providing that he shall be vested with the executive power, shall be responsible for faithful execution of the laws and may by appropriate legal action enforce constitutional and legislative mandates within the executive branch." *Id.* at 309.

As one delegate explained, "The new Resolution 58 permits the governor to continue to direct the affairs of the State and now he must enforce respect for legislative mandates, powers, rights and duties." *Id.* at 288. This delegate also explained that the ratified amendments were intended to be consistent with the doctrine of separation of powers. *See id.* As he stated:

> Now we know the doctrine [of separation of powers] is essential to American government and we know it requires constant implementation. Whenever the executive branch needs authority, it cannot legislate one word. Only the Legislature manufactures authority. *If the General Court needs better enforcement, it cannot enforce compliance or restrain violations. These are executive functions.*

*Id.* (emphasis added).

This history reveals that the intended purpose of Part II, Article 41 is to grant the executive branch the *exclusive* power to *enforce* the law. *See Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928) ("Legislative power . . . is the authority to make laws, but not to enforce them . . . . The latter [is an] executive function[ ]."). Enforcement "includes criminal as well as civil process." *State v. McPhail*, 180 So. 387, 390 (Miss. 1938); *see United States v. Armstrong*, 517 U.S. 456, 464 (1996) (enforcing criminal laws is within the "special province" of the executive (quotation omitted)); *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *see also Riley v. Cornerstone Community Outreach*, 57 So. 3d 704, 720 (Ala. 2010). As the Second Circuit Court of Appeals has explained, "The Executive Branch . . . has the exclusive authority not only to decide whether to prosecute, but also to decide which of alternative statutory sections, which may carry penalties of varying severity, the defendant will be charged with violating." *United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008).

██ The executive branch is also responsible for initiating civil actions on behalf of the State. As the United States Supreme Court has observed, "[a] lawsuit is the ultimate remedy for a breach of the law," *Buckley*, 424 U.S.

at 138, and it is the Governor whom the New Hampshire Constitution makes "responsible for the faithful execution of the laws," N.H. CONST. pt. II, art. 41; *see State Through Bd. of Ethics v. Green*, 545 So. 2d 1031, 1036 (La. 1989) ("The authority to file a civil lawsuit has traditionally been held to constitute an execution of the laws," and the power to ensure that the laws are faithfully executed is committed to the governor · under the Louisiana Constitution.).

HB 89 would usurp this essential power because it would divest the executive branch entirely of its authority to decide whether to initiate a particular civil action on the part of the State. The executive branch, not the legislative branch, is empowered to protect the interests of the people by taking care that the laws are faithfully executed. As the United States Supreme Court has explained, the enforcement power "exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function." *Buckley*, 424 U.S. at 138. Enforcement actions are within the "special province" of the executive. *Armstrong*, 517 U.S. at 464 (quotation omitted).

It is the executive, not the legislative branch, in which the constitution vests the "supreme executive" authority to determine whether it is in the public interest to litigate a particular matter. Necessarily, this includes the decision *not* to initiate a specific civil action on the part of the State. The executive branch alone has the power to decide the State's interest in litigation. If enacted, HB 89's usurpation of an exclusively executive function would violate the separation of powers doctrine. *See Opinion of the Justices*, 129 N.H. 714, 718-19 (1987).

The Senate, Speaker O'Brien and Majority Leader Bettencourt argue that HB 89 amounts to nothing more than exercise of one of the legislature's essential powers, *i.e.*, "to set forth the several duties, powers, and limits, of the several civil and military officers of this state . . . so as the same be not repugnant or contrary to this constitution." N.H. CONST. pt. II, art. 5. As previously noted, however, the legislature's power to set forth duties of civil and military officers is constrained by other constitutional provisions.

Here, HB 89 would mandate a specific action by the attorney general that implicates the executive branch's power to enforce the law. In mandating this action — to join a specific lawsuit on a particular side — the legislature would exceed its authority to prescribe the duties of the attorney general. In so doing, it would deprive the executive of its essential power to determine the State's interest in civil litigation. While the legislature is responsible for setting forth the duties of "the several civil and

military officers of this state," it may not do so in a way that usurps one of the executive branch's essential powers.

Moreover, the Governor is the head of the executive branch. The attorney general is a member of the executive branch, and is a constitutional officer, appointed by the Governor and Council pursuant to Part II, Article 46 of the New Hampshire Constitution. *See Opinion of the Justices*, 115 N.H. 159, 161 (1975). The Governor is the "supreme executive magistrate." N.H. CONST. pt. II, art. 41. The Governor has the highest authority in the executive branch, including the authority to initiate an "appropriate court action or proceeding" to "enforce compliance with any constitutional or legislative mandate, or restrain violation of any constitutional or legislative power, duty, or right, by any officer, department or agency of the state." *Id.* Thus, given the Governor's constitutional position as "supreme executive magistrate," New Hampshire law recognizes the Governor's power to direct the attorney general to appear in pending actions on behalf of the State. *See* RSA 7:9 (2003) ("The governor and council may, in any action or proceeding, wherever pending, represent to the attorney general that he should appear to protect the interests of the state or of the people, and thereupon it shall be his duty to appear.").

The Senate distinguishes the Florida case from "the kind of civil or criminal enforcement action that the Attorney General typically commences on behalf of the state." "In an ordinary case," the Senate observes, "the Attorney General brings a criminal indictment to enforce the criminal law against an individual believed to have violated it, or an enforcement action against a person believed to have committed a civil wrong." The Senate impliedly acknowledges that in such a case, the legislature could not direct the attorney general to exercise his discretion in any particular way — to indict or sue a specific person or to refrain from so doing.

The Florida case, the Senate argues, is different. It is "policy-oriented litigation," and, in such a case, "[t]he democratically ·elected lawmaking sectors of the government should direct the state's course of action." "In policy-oriented litigation," the Senate asserts, "the state's interest may not always be clear," and deciding "[w]hether to enter the case, and on which side, are much more properly characterized as policy decisions than legal decisions." Speaker O'Brien and Majority Leader Bettencourt share this view: "[I]t cannot be overemphasized that the decision whether to join the [Florida case] is a political decision, not a legal decision."

The arguments pressed by the Senate, Speaker O'Brien and Majority Leader Bettencourt imply that because the purpose of the mandate to the attorney general is politically based, arising out of the legislature's policy-making function, the inquiry ends there. However, the

policy-making authority to determine whether the State should join the Florida lawsuit has been delegated by the constitution to the executive branch. It is the executive, not the legislative branch, in which the constitution vests the power to determine the State's interest in any litigation.

The Senate observes that HB 89 "is not the first time" that the legislature has directed the attorney general to take specific action in a pending case. The Senate notes that in 1994, the legislature passed a law mandating the attorney general to "pursue settlement of the border dispute between the state of New Hampshire and the state of Maine." Laws 1994, 264:2.

The Senate's reliance upon this law is misplaced. First, although the attorney general apparently raised separation of powers questions about this legislation, he never challenged it in court, and, thus, there was never any definitive determination as to the law's constitutionality. We are the final arbiter of State constitutional disputes, *Petition of Below*, 151 N.H. at 139, and we were never called upon to consider the constitutionality of 1994, 264:2 or any other law directing the attorney general to take a specific action in a particular civil case.

Second, Laws 1994, 264:2, a general directive to the attorney general to "pursue settlement," is qualitatively different from HB 89, a specific legislative command that the attorney general not only enter the Florida case but do so on the side of the plaintiffs. *Cf. Nelson v. Wyman*, 99 N.H. 33, 37-39 (1954) (legislature may direct attorney general to conduct investigation and report findings to legislature). There is no suggestion that the purpose of Laws 1994, 264:2 was to require the attorney general to settle the border dispute under any and all circumstances and regardless of his assessment of the merits of any particular resolution, and as the Senate acknowledges, the border dispute was not in fact settled. *See New Hampshire v. Maine*, 532 U.S. 742 (2001).

Speaker O'Brien and Majority Leader Bettencourt also rely upon legislative precedent. They argue that the legislature's "[c]ontemporaneous [c]onstruction" is relevant to determine the meaning of the constitutional provisions at issue. *See Warburton*, 136 N.H. at 389. However, the precedents upon which they rely, from the 1780's and 1790's, are not "[c]ontemporaneous" with the 1966 amendments to Part II, Article 41, which were intended to "vest in the Governor strengthened executive power and responsibility." *Opinion of the Justices*, 113 N.H. at 148. How the legislature interpreted Part II, Article 41 in the 1780's and 1790's is of little help in determining its meaning in light of the 1966 constitutional amendments.

■ Accordingly, for all of the above stated reasons, we conclude that HB 89, which removes entirely from the executive branch the decision as to whether to join the State as a party to litigation, would usurp the executive branch's power to execute and enforce the law. Therefore, in our opinion, HB 89, as passed by the House, violates the Separation of Powers Clause and is unconstitutional. That being the case, it follows that HB 89 does not "fall within the broad grant of authority to the general court set forth in Part II, Article 5 of the New Hampshire constitution."

LINDA STEWART DALIANIS

JAMES E. DUGGAN

GARY ELLIS HICKS

CAROL ANN CONBOY

ROBERT J. LYNN

*William L. Chapman*, of Concord, filed a memorandum in support of an affirmative answer to the first question presented.

*Michael A. Delaney*, attorney general, & a., filed a memorandum in support of affirmative answers to the first and third questions presented and a negative answer to the second question presented.

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Richard J. Lehmann* on the memorandum), filed a memorandum on behalf of the New Hampshire Senate in support of negative answers to the first and third questions presented and an affirmative answer to the second question presented.

*Wilbur A. Glahn, III* and *Patrick H. Taylor*, of Manchester, filed a memorandum on behalf of former members of the Office of Attorney General of New Hampshire in support of affirmative answers to the first and third questions presented.

James Upshur McClammer, Jr., of Charlestown, filed a memorandum in support of an affirmative answer to the first question presented.

*Mosca Law Office*, of Manchester (*Edward C. Mosca* on the memorandum), filed a memorandum on behalf of William O'Brien, Speaker, and David J. Bettencourt, Majority Leader, of the New Hampshire House of Representatives, in support of negative answers to the first and third questions presented and an affirmative answer to the second question presented.

NH Voices for Health, of Concord (Michael J. Cohen and *Thomas G. Bunnell* on the memorandum), filed a memorandum in support of an affirmative answer to the first question presented.

Gregory J. Vasse, of New London, filed a memorandum in support of an affirmative answer to the first question presented.